**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHWESTERN DIVISION**

| | |
|---|---|
| Mark Iverson, ) | |
| ) | **ORDER GRANTING DEFENDANTS** |
| Plaintiff, ) | **PETRO-HUNT'S AND RPM** |
| ) | **CONSULTING'S MOTIONS FOR** |
| vs. ) | **SUMMARY JUDGMENT** |
| ) | |
| Bronco Drilling Company, Inc., ) | |
| Petro-Hunt, L.L.C., RPM Consulting, Inc., ) | |
| and Kenneth McIntyre, individually and ) | |
| d/b/a/ McIntyre Consulting, ) | Case No. 4:08-cv-010 |
| ) | |
| Defendants. ) | |

Before the Court are Defendant Petro-Hunt, L.L.C.'s and Defendant RPM Consulting, Inc.'s motions for summary judgment filed on January 15, 2009 and September 1, 2009. See Docket Nos. 20 and 50. The Plaintiff filed responses on February 16, 2009 and September 24, 2009. See Docket Nos. 22, 52, and 53. Petro-Hunt filed a reply brief on February 26, 2009 and a supplemental memorandum on August 25, 2009. See Docket Nos. 24 and 49. The Court grants the motions for the reasons set forth below.

**I.   BACKGROUND**

The plaintiff, Mark Iverson, is a resident of Williston, North Dakota. Defendant Bronco Drilling Company, Inc. is a Delaware corporation with its principal place of business in Edmond, Oklahoma. Defendant Petro-Hunt, L.L.C. is a Delaware corporation with its principal place of business in Dallas, Texas. Defendant RPM Consulting, Inc. is a Colorado corporation with its principal place of business in Denver, Colorado. Defendant Kenneth McIntyre is a resident of Trout Creek, Montana.

Petro-Hunt, a company engaged in oil field development, leases and operates the Gordon Hall oil and gas well in Divide County, North Dakota. In 2005, Petro-Hunt entered into a written contract with Bronco Drilling to drill the well. See Docket No. 22-2. Petro-Hunt, by oral agreement, retained RPM Consulting, Inc., an oil field consulting company, to supervise the day-to-day drilling operations at the Gordon Hall well. RPM Consulting subsequently retained McIntyre by oral agreement to be the "company man" at the well. A company man supervises the drilling operations at a well. Among other duties as company man, McIntyre was to provide Petro-Hunt with daily well status reports, provide the North Dakota Industrial Commission with all required data and reports, ensure applicable safety and environmental policies were implemented, and provide technical guidance to ensure tools were properly used.

On September 4, 2007, Mark Iverson, a service technician for M-I SWACO at the time, was dispatched with his partner, Brad Murie, to the Gordon Hall well where they were to "rig up" a centrifuge and choke. When Iverson and Murie arrived at the well at approximately 12:30 p.m., Murie went to the "company man shack" to inform McIntyre that he and Iverson were there to rig up the centrifuge and choke. Iverson and Murie completed their work on the centrifuge and then went to a platform to work on a choke panel at approximately 2:10 p.m. Iverson dropped choke lines through a hole in the platform and then went into the substructure below the platform to hook up the choke lines. In a deposition, Iverson stated that he was pulling the choke lines tight when he heard an air hoist start and someone yell "look out." See Docket No. 21-7. An air hoist is a device that lifts and moves surface casing pipe (casing). Kim Broderson, a tool pusher for Bronco Drilling, was moving casing with an air hoist when the casing errantly went into the substructure and struck Iverson.

Prior to the accident, there was a safety meeting held at the Gordon Hall well at approximately 2:00 p.m. The safety meeting was supposed to be attended by every contractor present at the well. One of the items addressed at the meeting was that nobody was to be in the substructure when casing was being moved. In a deposition, McIntyre stated that he did not believe that Iverson and Murie were at the safety meeting, and that it was the responsibility of Randy Skarda, an employee of Bronco Drilling, to make sure that everyone at the Gordon Hall well was at the meeting. See Docket No. 21-5.

On January 18, 2008, Iverson filed a complaint against Petro-Hunt and Bronco Drilling in which he seeks damages for the injuries he suffered when the casing struck him. See Docket No. 1. Iverson contends in the complaint that the Defendants each owed a duty of care to safely move the casing and to avoid injuries to workers at the Gordon Hall well. Iverson argues that the Defendants negligently breached their duties by failing to safely move the casing, failing to use proper equipment and techniques, failing to warn Iverson, and failing to take proper precautions. Petro-Hunt filed a motion for summary judgment on January 15, 2009. See Docket No. 20. On April 6, 2009, Iverson filed an amended complaint, adding RPM Consulting and Kenneth McIntyre as defendants. See Docket No. 34.

The Court amended the pretrial deadlines on June 3, 2009, allowing a September 1, 2009 deadline for the Defendants to supplement the pending motions for summary judgment or file additional dispositive motions regarding the issue of independent contractor liability. See Docket No. 47. Petro-Hunt filed a supplemental memorandum in support on August 25, 2009. See Docket No. 49. RPM Consulting filed a motion for summary judgment on September 1, 2009. See Docket

No. 50. Neither Bronco Drilling nor Kenneth McIntyre has filed a motion for summary judgment or joined Petro-Hunt's or RPM Consulting's motions.

Petro-Hunt first contends that it is not directly liable for Iverson's injuries because it did not have any employees at the well and was not directly involved in the activities that led to Iverson's injuries. Petro-Hunt contends that it did not owe Iverson a duty to protect him from injuries caused by the acts or omissions of independent contractors, RPM Consulting, Ken McIntyre, and Bronco Drilling, because it did not retain control over RPM Consulting or Ken McIntyre, and reasonably delegated its retained control over Bronco Drilling to RPM Consulting. Petro-Hunt also contends that it did not owe Iverson a duty to protect him from injuries caused by the acts or omissions of RPM Consulting, Ken McIntyre, and Bronco Drilling because "the delegated task at issue, moving casing, can be performed safely and without extraordinary risk to the individuals on site when conducted in an ordinary and reasonable manner." See Docket Nos. 21 and 49.

RPM Consulting adopts Petro-Hunt's legal arguments and relevant factual statements. RPM Consulting further contends that it hired McIntyre as an independent contractor, did not retain control over McIntyre's activities, was not negligent in hiring McIntyre, and the activities McIntyre performed were not of such a nature as to make the duty of care non-delegable. On the basis that RPM Consulting hired McIntyre as an independent contractor and did not retain control over the work being performed by McIntyre, Iverson has no objection to RPM Consulting's motion for summary judgment. See Docket No. 52.

Iverson contends that there are genuine issues of material fact as to whether RPM Consulting and McIntyre were employee-agents and not independent contractors of Petro-Hunt. Iverson contends that even if RPM Consulting, McIntyre, and Bronco Drilling are found to be independent

4

contractors, there is still a genuine issue of material fact as to whether Petro-Hunt retained control over the work performed by McIntyre and Bronco Drilling and, therefore, owed Iverson a duty to protect him from injuries caused by the acts or omissions of McIntyre and Bronco Drilling.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, indicates no genuine issues of material fact exist and, therefore, the moving party is entitled to judgment as a matter of law. Davison v. City of Minneapolis, Minn., 490 F.3d 648, 654 (8th Cir. 2007); see Fed. R. Civ. P. 56(c). Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party. Id.

The Court must inquire whether the evidence presents sufficient disagreement to require the submission of the case to a jury or if it is so one-sided that one party must prevail as a matter of law. Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 832 (8th Cir. 2005). The moving party first has the burden of demonstrating an absence of genuine issues of material fact. Simpson v. Des Moines Water Works, 425 F.3d 538, 541 (8th Cir. 2005). The non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

**III.     LEGAL DISCUSSION**

Iverson has brought a negligence claim based on diversity jurisdiction. It is well-established that in an action based on diversity jurisdiction, the Court "will apply the substantive law of North Dakota." Atkinson v. McLaughlin, 462 F. Supp. 2d 1038, 1047 (D.N.D. 2006). "To establish a cause of action for negligence, a plaintiff must show the defendant has a duty to protect the plaintiff from injury." Rogstad v. Dakota Gasification Co., 623 N.W.2d 382, 385 (N.D. 2001). "Negligence consists of a duty on the part of an allegedly negligent party to protect the plaintiff from injury, a failure to discharge the duty, and a resulting injury proximately caused by the breach of the duty." Grewal v. N.D. Ass'n of Counties and Nw. Contracting, Inc., 670 N.W.2d 336, 339 (N.D. 2003). The existence of a duty is generally a question of law for the court to decide. Id. However, if the existence of a duty depends on the resolution of factual issues, those issues must be resolved by the trier of fact. Id. "If no duty exists, there is no negligence." Rogstad, 623 N.W.2d at 385.

"The key question in determining if an individual is an independent contractor or an employee focuses on who is in control." Doan v. City of Bismarck, N.D., 632 N.W.2d 815, 821 (N.D. 2001). "The employer's right to direct or control the means and manner of performing the work is dispositive regarding the employee or independent contractor classification, whether or not the right has been exercised." Id. "Under the doctrine of respondeat superior, if an individual is not an independent contractor, agency principles provide that the employer is vicariously liable to third persons for the negligence of the employer's agent in the transaction of the business of the agency." Id. at 822. The rationale for the doctrine of respondeat superior is based on the employer's right to control the employee's conduct. Id.

Conversely, an employer of an independent contractor is generally not liable for the acts or omissions of the independent contractor. Grewal, 670 N.W.2d at 339. Despite this general rule, the Restatement (Second) of Torts § 414 creates an exception:

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

Restatement (Second) of Torts § 414 (1965). "The duty created by Section 414 may arise through an express contractual provision retaining the right to control some part of the operative details of the independent contractor's work, or through the employer's actual exercise of retained control of the work." Grewal, 670 N.W.2d at 339-40.

"The liability created by Section 414 arises only when the employer retains the right to control the method, manner, and operative detail of the work; it is not enough that the employer merely retains the right to inspect the work or to make suggestions which need not be followed." Fleck v. ANG Coal Gasification Co., 522 N.W.2d 445, 448 (N.D. 1994). Comment c to Restatement (Second) of Torts § 414 clarifies:

> In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.

"The doctrine of retained control does not make the employer vicariously liable for the independent contractor's acts; rather, it creates an independent basis of liability for the employer's failure to exercise retained control with reasonable care." Rogstad, 623 N.W.2d at 386.

7

"A determination that an exception to the general rule of employer non-liability applies in a given case is tantamount to a determination that the employer in that case has a duty. Whether or not one owes a duty to another in a case such as this is an issue of law which the court must resolve before allowing a jury to hear evidence of negligence and proximate cause." Peterson v. City of Golden Valley, N.D., 308 N.W.2d 550, 553 (N.D. 1981).

Iverson concedes that RPM Consulting maintained an independent contractor relationship with McIntyre and that RPM Consulting did not retain control over the work performed by McIntyre. Iverson has stated he has no objection to RPM Consulting's motion for summary judgment. See Docket No. 52. Therefore, the Court need only address Petro-Hunt's motion for summary judgment and Petro-Hunt's relationship with RPM Consulting, McIntyre, and Bronco Drilling.

### A.     RPM CONSULTING

Petro-Hunt argues that it retained RPM Consulting, by oral agreement, as an independent contractor to supervise and direct "the day to day activities of Bronco and all other contractors providing services at the Gordon Hall well site." See Docket No. 21. Therefore, Petro-Hunt contends that it did not owe Iverson a duty to protect him from injuries caused by RPM Consulting's acts or omissions because it did not retain control over RPM Consulting.

Iverson contends that there is a genuine issue of material fact as to whether RPM Consulting was an employee-agent of Petro-Hunt rather than an independent contractor. Iverson argues, that "there is no written contract between Petro-Hunt and RPM from which it can be determined whether RPM is acting as an agent or independent contractor. Thus, there is nothing in writing to establish

whether Petro-Hunt has the right to control the manner and method of the work performed by RPM to complete the project." See Docket No. 22. "Further, there is nothing in the record to establish that RPM was operating without the supervision and control of Petro-Hunt." See Docket No. 22.

Although there is not a written contract that establishes RPM Consulting as an independent contractor, Petro-Hunt and RPM Consulting agree that RPM Consulting was retained as an independent contractor. Kyle Hudson, president of RPM Consulting, states in an affidavit that Petro-Hunt did not retain any control over the method and manner of how RPM Consulting exercised its delegated authority. See Docket No. 24-1. Iverson has failed to produce any evidence that Petro-Hunt possessed the right to direct or control the means and manner of the work RPM Consulting performed. Further, Iverson has failed to produce evidence of how Petro-Hunt retained control over any work performed by RPM Consulting. There has not been any evidence produced which indicates such a retention of a right of supervision by Petro-Hunt that RPM Consulting was not entirely free to perform work in its own way. The Court finds that there is no genuine issue of material fact as to RPM Consulting's status as an independent contractor. The Court further finds that Petro-Hunt did not owe Iverson a duty to protect him from injuries caused by RPM Consulting's acts or omissions because Petro-Hunt did not retain control over the work performed by RPM Consulting.

### B.     McINTYRE

Petro-Hunt argues that it did not retain McIntyre in any capacity and that RPM Consulting retained McIntyre as an independent contractor. Therefore, Petro-Hunt contends that it did not owe

9

Iverson a duty to protect him from injuries caused by McIntyre's acts or omissions because it did not retain or exercise control over the work performed by McIntyre.

Iverson contends that there is a genuine issue of material fact as to whether McIntyre was an employee-agent of Petro-Hunt rather than an independent contractor. Iverson argues that there are no contracts that establish McIntyre as an independent contractor, McIntyre acted like an employee-agent, and McIntyre did not have absolute control over the work performed at the Gordon Hall well.

A thorough review of the record is necessary to determine the employment status of McIntyre. McIntyre submitted invoices and was paid by RPM Consulting. RPM Consulting then submitted invoices to Petro-Hunt. See Docket No. 49-1. In a deposition, McIntyre indicates that he was an independent contractor of RPM Consulting. See Docket No. 21-5, p. 9. McIntyre was then asked, "How do you get your assignments as to where you're supposed to go next after you finish a project?" McIntyre answered, "I don't. I've been working for Petro-Hunt." See Docket No. 21-5, p. 10. McIntyre then indicated that Petro-Hunt tells him where to go next after work is done on a rig. See Docket No. 21-5, p. 11.

James Hillman, the drilling superintendent for Petro-Hunt, states in an affidavit that he was responsible for Petro-Hunt's general oversight of the operations at the Gordon Hall well. Hillman states that he "would have communications with Mr. McIntyre regarding status updates and discussions if something out of the ordinary was taking place. In addition, [he] would receive daily reports by e-mail from Mr. McIntyre." See Docket No. 21-1. Petro-Hunt provided McIntyre with a computer and fax machine so that he could submit daily reports. See Docket No. 21-5, p. 95. Kyle Hudson of RPM Consulting indicates that McIntyre "reported directly to [Petro-Hunt's] personnel

10

regarding status updates and discussions if something out of the ordinary was taking place." See Docket No. 24-1.

McIntyre states that when he began working at the Gordon Hall well, an air hoist was used to pull up the casing. This practice was replaced by the laydown machine method after Iverson was injured. After McIntyre learned of the accident, McIntyre called James Hillman of Petro-Hunt. Hillman advised McIntyre to call a safety coordinator at Petro-Hunt. See Docket No. 21-5, pp. 39-40. The safety coordinator advised McIntyre to get copies of the accident reports filed by M-I SWACO and Bronco Drilling. McIntyre indicates that the decision to switch to a laydown machine was made after he talked to Hillman. Hillman did not instruct McIntyre to switch from the air hoist to the laydown machine but he was in agreement that this change should be made. See Docket No. 21-5, p. 35.

Hillman states that he "had no communication with Mr. McIntyre related to how Bronco Drilling would pick up the surface casing. That was a decision that was made on-site and would usually be made by Mr. McIntyre and Bronco [D]rilling, Inc." See Docket No. 21-1. However, Kim Broderson, Bronco Drilling's tool pusher at the Gordon Hall well, stated in a deposition that it was "Petro-Hunt's deal" in reference to the decision of whether to use a laydown machine or an air hoist. See Docket No. 21-6, p. 151.

Iverson argues that Petro-Hunt, and not RPM Consulting or McIntyre, hired Bronco Drilling to handle the drilling operations at the Gordon Hall well. Further, Iverson argues that Petro-Hunt hired American Casing & Equipment and M-I SWACO to provide services at the Gordon Hall well. See Docket Nos. 22-3 and 22-4. This, Iverson contends, indicates a level of control asserted and retained by Petro-Hunt. An invoice that sets forth the retention of two service technicians from M-I

11

SWACO (Iverson and Murie) to work on the Gordon Hall well, indicated that Petro-Hunt was to be billed. On the service ticket produced by M-I SWACO, Petro-Hunt is listed as the customer and the ticket is signed by McIntyre. See Docket No. 22-4. McIntyre also signed the American Casing & Equipment invoice for work to be performed for Petro-Hunt but indicated that he signed for Petro-Hunt. See Docket No. 22-3.

The Court finds that McIntyre was not an employee-agent of Petro-Hunt. Petro-Hunt did not possess the right to direct or control McIntyre's work to a degree normally found in an employer-employee relationship. McIntyre entered into an agreement with RPM Consulting and was paid by RPM Consulting, not Petro-Hunt. McIntyre submitted invoices to RPM Consulting, and RPM Consulting then submitted invoices to Petro-Hunt. See Docket No. 49-1. "The absence of regular, periodic payments is an indicia of independent contractor status." Kirk v. Harter, 188 F.3d 1005, 1008 (8th Cir. 1999) (where the alleged employee did not use a time clock or submit the number of hours he worked, except in the form of an invoice).

Although McIntyre indicated that Petro-Hunt would inform him where to go after completing work on a rig, there is no indication that McIntyre was not free to leave a Petro-Hunt well in search of work elsewhere. An employee-agent would not have this luxury, but an independent contractor would. Although McIntyre was retained and paid by RPM Consulting, there is enough of a relationship between McIntyre and Petro-Hunt to indicate that an employer-independent contractor relationship exists. Because McIntyre was an independent contractor of Petro-Hunt, Petro-Hunt owed Iverson a duty for the acts or omissions of McIntyre only if it retained control over the work performed by McIntyre.

Although McIntyre provided status reports to James Hillman, the drilling superintendent for Petro-Hunt, using a computer and fax machine provided by Petro-Hunt, the Court finds that this does not rise to the level of retained control required by Section 414. This is nothing more than the general right to receive reports that Section 414 makes clear is "not enough." The fact that McIntyre chose to go from rig to rig on wells operated by Petro-Hunt also does not indicate sufficient retained control. McIntyre's decision to perform work for Petro-Hunt does not indicate that Petro-Hunt retained control over how McIntyre performed work.

"Cases applying the doctrine indicate merely providing equipment is not the kind of control that creates a duty." Kristianson v. Flying J Oil & Gas, Inc., 553 N.W. 2d 186, 190 (N.D. 1996). Instead, "a duty arises only if the employer, in addition to providing the equipment, also directly supervises or controls its use, or instructs the independent contractor's employee on use of the equipment." Id. It is clear that Petro-Hunt provided the equipment to be used at the Gordon Hall well. Kim Broderson of Bronco Drilling indicates that it was Petro-Hunt's "deal" as to whether a laydown machine or an air hoist was used to move casing. However, James Hillman states that the decision of how to move casing was McIntyre's. McIntyre conferred with Hillman after Iverson's accident about which method to use, but he was not instructed to use a certain method. These facts indicate that Petro-Hunt merely provided an air hoist and a laydown machine, and that it was ultimately up to McIntyre to decide which method to use. Petro-Hunt did not directly supervise or control the use of the equipment, nor is there evidence that Petro-Hunt instructed McIntyre or anyone else on how to use the equipment. The fact that McIntyre conferred with Hillman merely indicates that Petro-Hunt was in a position to make suggestions or recommendations that McIntyre

did not have to follow.  At most, this was Petro-Hunt prescribing an alteration or deviation which is not sufficient retained control under Section 414.

The fact that Petro-Hunt hired Bronco Drilling does not pertain to how McIntyre performed his work at the Gordon Hall well.  The hiring of another company to perform work on a well does not indicate a retention of control over McIntyre's method of work or operative detail.  And even if Petro-Hunt had hired M-I SWACO and American Casing & Equipment, Iverson fails to explain how this correlates to Petro-Hunt's retained control over the method and manner of how McIntyre performed his work.  In actuality, it appears that McIntyre handled the hiring of M-I SWACO and American Casing & Equipment because he signed the service ticket and invoice.

The Court finds that Petro-Hunt did not retain the right to control the method, manner, and operative detail of Ken McIntyre's work.  At most, Petro-Hunt retained the right to receive status reports, purchase equipment, make suggestions that did not have to be followed, and prescribe alterations and deviations.  Section 414 of the Restatement (Second) of Torts makes it clear that this level of retained control is not sufficient to create a duty for the employer of an independent contractor.  Further, even if Petro-Hunt had retained sufficient control over McIntyre to create a duty under Section 414, Iverson has failed to produce any evidence that Petro-Hunt did not use reasonable care in exercising that retained control.

### C.  **BRONCO DRILLING**

Petro-Hunt and Bronco Drilling entered into a contract in which Bronco Drilling agreed to "furnish equipment, labor, and perform services . . . for a specified sum per day under the direction, supervision and control of [Petro-Hunt] (inclusive of any employee agent, consultant or

14

subcontractor engaged by [Petro-Hunt] to direct drilling operations)." See Docket No. 22-2. The contract refers to Bronco Drilling as an independent contractor of Petro-Hunt. See Docket No. 22-2. Iverson does not appear to dispute Petro-Hunt's contention that Bronco Drilling was an independent contractor of Petro-Hunt. The Court finds that Bronco Drilling was an independent contractor of Petro-Hunt.

Petro-Hunt contends that it did not owe Iverson a duty to protect him from the acts or omissions of Bronco Drilling while it moved the casing because Bronco Drilling was an independent contractor over which Petro-Hunt reasonably delegated control to RPM Consulting. Petro-Hunt acknowledges that pursuant to the contract with Bronco Drilling, it retained control over the daily activities of Bronco Drilling. Petro-Hunt also acknowledges that an independent duty arose requiring Petro-Hunt to reasonably exercise the retained control. Petro-Hunt contends that it exercised its retained control by delegating that control to RPM Consulting.

Iverson contends that "even though Bronco may arguably qualify as an independent contractor, Petro-Hunt cannot avoid liability." See Docket No. 22. Iverson further contends that "Petro-Hunt retained control over the methods and details of Bronco's work and exercised that control." See Docket No. 22. "Not only did Petro-Hunt have the contractual right to control, Petro-Hunt exercised that control by means of its onsite representative, McIntyre." See Docket No. 22.

Because Bronco Drilling was an independent contractor of Petro-Hunt and Petro-Hunt acknowledges that it retained control over Bronco Drilling, Petro-Hunt owed Iverson a duty to reasonably exercise the retained control. Thus, the lone determination the Court must make is whether Petro-Hunt exercised its retained control over Bronco Drilling with reasonable care by delegating control to RPM Consulting.

> John Gillespie, a professional engineer in the oil and gas industry, states in an affidavit,
>
> > In the oil & gas industry, it is an accepted and common practice for an entity engaged in oil field development to delegate complete control over the day to day drilling operations to an independent contractor that specializes in oil field consulting. This practice is commonplace as the oil field consulting entities have a very specialized and effective skill set that allows the consulting entities to meet the developer's goals in a safe and efficient manner.

See Docket No. 21-3. Petro-Hunt contends that it "acted reasonably in selecting RPM to act as the oil [field] consultant for the Gordon Hall well site. RPM was in a better position to exercise operative control over Bronco than Petro-Hunt and Petro-Hunt acted reasonably in delegating its retained control to RPM in drilling the Gordon Hall." See Docket No. 21. According to Kyle Hudson of RPM Consulting, Petro-Hunt had utilized RPM Consulting on three previous well projects. See Docket No. 24-1.

Petro-Hunt retained its control over Bronco Drilling by retaining RPM Consulting to supervise the day-to-day operations at the Gordon Hall well. Iverson has failed to produce any evidence that this delegation was done in an unreasonable manner. It is custom and practice in the industry to delegate the supervision of a well to a company that specializes in oil field consulting and Petro-Hunt had retained RPM Consulting on three prior occasions. Thus, the Court finds that Petro-Hunt retained control over Bronco Drilling with reasonable care by delegating the control to RPM Consulting.

### IV.    CONCLUSION

The Court finds, after viewing the evidence in a light most favorable to Iverson, that Petro-Hunt did not retain control over the manner, method, or operative detail of the work performed by RPM Consulting and McIntyre, and exercised reasonable care in delegating its retained control over

Bronco Drilling to RPM Consulting. Therefore, Petro-Hunt did not owe Iverson a duty to protect him from injuries caused by the acts or omissions of RPM Consulting and McIntyre, and did not negligently retain control over Bronco Drilling. Further, there has been no contention that Petro-Hunt is liable for anything other than the acts or omissions of others, or that Petro-Hunt incurred liability because the task of moving casing involved extraordinary risk. The Court **GRANTS** Petro-Hunt's motion for summary judgment (Docket No. 20). Since Iverson does not object to RPM Consulting's motion, the Court also **GRANTS** RPM Consulting's motion for summary judgment (Docket No. 50).

**IT IS SO ORDERED.**

Dated this 4th day of November, 2009.

*/s/ Daniel L. Hovland*
Daniel L. Hovland, District Judge
United States District Court